## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## SHREVEPORT DIVISION

---

| | |
|---|---|
| **GREGORY V. TUCKER** | **CIVIL ACTION NO.: 17-1485** |
| **VERSUS** | **JUDGE ELIZABETH ERNY FOOTE** |
| **CITY OF SHREVEPORT, ET AL.** | **MAGISTRATE JUDGE HAYES** |

---

### MEMORANDUM RULING

This excessive-force case arises from an encounter between Plaintiff, Gregory Tucker ("Tucker"), and four officers ("Defendant Officers") of the Shreveport Police Department. Because he was pulled to the ground and beaten while being arrested, Tucker brings an action under 42 U.S.C. § 1983 and under Louisiana constitutional and tort law. [Record Document 1 at 6–8]. The City of Shreveport (the "City"), Chandler Cisco ("Cisco"), William McIntire ("McIntire"), Yondarius Johnson ("Johnson"), and Tyler Kolb ("Kolb") (collectively, "Defendants") have filed a motion for summary judgment. [Record Document 29]. For the reasons given below, the motion is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is **GRANTED** in favor of Defendant Officers in their official capacities on all claims. Summary judgment is **DENIED** as to all claims against the City and the § 1983, Louisiana constitutional, and state-law tort claims against Defendant Officers in their individual capacities.

### I.    Background

On December 1, 2016, Cisco spotted Tucker driving on 70th Street in Shreveport, Louisiana without working brake and license plate lights. [Record Documents 29-3 at 133 and

1

32-4 at 2]. Cisco activated his lights and siren. [Record Document 29-3 at 133]. Rather than immediately stop on the side of the road or in the parking lot of one of the businesses along the street, Tucker continued driving for approximately two minutes. [Record Document 29-3 at 3 (Cisco Video at 23:33:42–:35:40)]. He led Cisco into a neighborhood off of 70th Street and finally came to a stop in the driveway of a home. [*Id.* at 23:35:40)]. Cisco admits that Tucker never sped after Cisco activated his lights and siren. [Record Document 32-4 at 3–4].

Cisco asked Tucker to exit his vehicle. [Record Documents 29-2 at 2 and 32 at 5]. Tucker did so, and Cisco conducted a brief pat-down beside Tucker's car. [Record Documents 29-2 at 2 and 32 at 5]. Cisco then instructed Tucker to come over to Cisco's police cruiser and to place his hands on the hood. [Record Document 29-2 at 2]. Tucker leaned onto the hood, resting primarily on his elbows. [Record Document 29-3 at 3 (Cisco Video at 23:36:23–:55), 31]. Cisco then conducted a more complete pat-down and located a pocketknife, which he removed from Tucker's pocket. [Record Document 29-2 at 2]. Throughout this portion of the encounter, Tucker remained in front of Cisco's police cruiser and made no signs indicating that he was likely to flee. Although he was gesturing, his hands remained in the space above the hood of Cisco's cruiser. [Record Document 29-3 at 3 (Cisco Video at 23:36:23–:55)]. As Cisco's dashboard camera shows, however, Tucker was clearly upset and repeatedly asked why he had been targeted for police attention. [*Id.*].

While the second search was going on, McIntire and Johnson arrived on the scene. [Record Documents 29-2 at 2 and 32 at 5]. Cisco told Tucker to place his hands behind his back. [Record Document 29-3 at 35, 137]. McIntire approached the pair, but did not inform Tucker that he was under arrest. [Record Document 29-3 at 67–68]. As discussed more fully

2

below, precisely what happened next is disputed, but Cisco was on Tucker's right side while McIntire approached Tucker's left. [Record Document 29-3 at 3 (Cisco Video at 23:26:55)]. Four seconds after McIntire arrived at Tucker's side, [*id.* at 23:36:55–:59], Cisco and McIntire forced Tucker onto the ground where he hit his head. [Record Document 29-3 at 39–40, 144].

As Tucker hit the ground, Kolb arrived on the scene. [Record Document 29-3 at 3 (Kolb Video at 23:37:00–:04)]. A struggle ensued with the officers repeatedly punching and striking Tucker, ostensibly in order to gain control of his hands and complete the arrest. [*Id.* at 3 (Cisco Video at 23:37:00–:57) (McIntire Video at 23:37:00–:57) (Kolb Video at 23:37:04–:10)]. As he lay on the ground, the officers repeatedly yelled at him to put his hands behind his back. [*Id.* at 3 (McIntire Video at 23:37:12–:28) (Kolb video 23:37:09–:30)]. Eventually, they successfully placed him in handcuffs and stood him up. [Record Document 29-3 at 3 (Cisco Video at 23:38:18–:22)]. Tucker was ultimately booked for failure to have working brake and license plate lights, flight from an officer, and public intimidation. [*Id.* at 5].

Although Tucker had been very vocal throughout the encounter, loudly and argumentatively objecting to his treatment, the tone of his voice notably changes after he began to be struck; it becomes the plaintive sound of a man in pain. [*Id.* at 3 (Kolb Video at 23:37:30–:55)]. After he stood up, he had what Johnson agreed was "a lot of blood" on his face, [*id.* at 109], and was transported to the hospital for medical examination, [Record Document 29-2 at 3]. Although he was only medically diagnosed with a cut on his forehead and a muscle strain in his left shoulder, [*id.*], Tucker claims additional injuries, including headaches, a swollen face, and a "sprung" knee as well as fear of being killed by the police, [Record Document 32-3 at 69–70, 81–82].

3

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[1] Summary judgment is appropriate when the pleadings, answers to interrogatories, admissions, depositions, and affidavits on file indicate that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the burden at trial will rest on the non-moving party, the moving party need not produce evidence to negate the elements of the non-moving party's case; rather, it need only point out the absence of supporting evidence. *See id.* at 322–23.

If the movant satisfies its initial burden of showing that there is no genuine dispute of material fact, the nonmovant must demonstrate that there is, in fact, a genuine issue for trial by going "beyond the pleadings" and "designat[ing] specific facts" for support. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Celotex*, 477 U.S. at 325). "This burden is not satisfied with some metaphysical doubt as to the material facts," by conclusory or unsubstantiated allegations, or by a mere "scintilla of evidence." *Id.* (internal quotation marks and citations omitted). However, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

---

[1] Rule 56 was amended effective December 1, 2010. Per the comments, the 2010 amendment was intended "to improve the procedures for presenting and deciding summary judgment motions and to make the procedures more consistent with those already used in many courts. The standard for granting summary judgment remains unchanged." Therefore, the case law applicable to Rule 56 prior to its amendment remains authoritative, and this Court will rely on it accordingly.

255 (1985) (citing *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). While not weighing the evidence or evaluating the credibility of witnesses, courts should grant summary judgment where the critical evidence in support of the nonmovant is so "weak or tenuous" that it could not support a judgment in the nonmovant's favor. *Armstrong v. City of Dall.*, 997 F.2d 62, 67 (5th Cir. 1993).

Additionally, Local Rule 56.1 requires the movant to file a statement of material facts as to which it "contends there is no genuine issue to be tried." The opposing party must then set forth a "short and concise statement of the material facts as to which there exists a genuine issue to be tried." W.D. La. R. 56.2. All material facts set forth in the movant's statement "will be deemed admitted, for purposes of the motion, unless controverted as required by this rule." *Id.*

## III. Disputed Facts

### A. Nature of the Area

Although McIntire insists that Tucker stopped in a high-crime area noted for drug activity, [Record Document 29-3 at 60], Tucker has testified that the house where he stopped was "not in the drug area. It's like a little bit out of the drug area," [Record Document 32-3 at 49]. Therefore, the Court infers that the location where Tucker chose to stop was not within an area known for drug activity.

### B. Cisco's Pat Down

While Tucker leaned over the police cruiser, Cisco patted him down and discovered the pocketknife. [Record Document 29-2 at 2]. McIntire saw the patdown, but testified that he did not know whether it had been completed. [Record Document 29-3 at 63, 72]. Cisco

then stopped patting Tucker down and asked him to place his hands behind his back. [Record Documents 29-3 at 3 (McIntire Video at 23:36:58) and 32-3 at 54]. Based on the fact that Cisco stopped his pat down and McIntire saw him do so, a jury could find that a reasonable officer in Cisco, Johnson, and McIntire's position would not have believed that Tucker had any further weapons on his person. Thus, the Court infers for summary judgment purposes that a reasonable officer in their position would have believed that Tucker was unarmed after Cisco removed the pocketknife.

### C.   Cisco and McIntire's Verbal Commands

Cisco told Tucker to place his hands behind his back, but cannot recall if he told Tucker he was under arrest. [Record Document 29-3 at 35–36]. McIntire also cannot recall if he gave any verbal orders to Tucker before grabbing him. [*Id.* at 66–67]. Therefore, the Court concludes for present purposes that the only verbal order given to Tucker before he was taken to the ground was Cisco's instruction to place his hands behind his back. [Record Document 32-3 at 54].

### D.   Tucker's Actions Prior to the Takedown

There are competing versions of what happened in the moments before Tucker was taken to the ground. Cisco testified that Tucker began to comply with the order to place his hands behind his back, that Tucker tensed his right arm and pulled his left arm away once McIntire touched it, and that either Cisco pushed Tucker to the ground or McIntire pulled him to the ground. [Record Document 29-3 at 34–36, 39]. McIntire asserts that when he grabbed Tucker's left wrist and started to pull Tucker's arm towards the back, Tucker tensed and started to pull his left arm forward. [*Id.* at 70–71]. According to McIntire, he grabbed

Tucker by the neck to pull him down, but Tucker got free of Cisco and swung around, causing McIntire to think he was going to be hit. [*Id.* at 71–72]. He then pulled Tucker to the ground. [*Id.* at 72]. Tucker asserts that he was putting his hands behind his back in compliance with Cisco's order when he glanced back and saw McIntire who immediately pulled Tucker down to the ground. [*Id.* at 137–38, 140]. Tucker claims that he did not pull away from Cisco and McIntire prior to being taken to the ground, and Johnson confirms that he did not see Tucker pull away. [*Id.* at 104, 137, 140].

Although there is video footage of these seconds before the takedown, the footage is not unequivocal. Cisco's dashboard camera shows McIntire grabbing Tucker's left arm to pull it back while Cisco grabs Tucker's right arm. [Record Document 29-3 at 3 (Cisco Video at 23:36:53–:37:00)]. Tucker's left arm moves down slightly, which could indicate that he had tensed his arm to pull it from McIntire's grasp (as McIntire asserts) or that McIntire was pulling the arm down and back; the camera angle makes it difficult to determine who was responsible for the arm's apparent movement. [*Id.*]. McIntire's dashboard camera (shooting the scene from the opposite direction) does not show Tucker pulling away from the officers' grasp. [*Id.* at 3 (McIntire Video at 23:36:53–:37:00)]. Neither video corroborates McIntire's claim that Tucker got free of Cisco or swung around as if hit McIntire. Because the Court must resolve disputed questions of fact in Tucker's favor, the Court infers that prior to being taken to the ground, Tucker complied with Cisco's order to place his hands behind his back and did not jerk his arm away from Cisco and McIntire.

### E.    Tucker's Behavior on the Ground

There is some dispute over whether Tucker was kicking at the officers as they attempted to place him in handcuffs. Tucker was kicking his feet, [*id.* at 49, 78], and the videos show his legs flailing, [*id.* at 3 (Cisco Video at 23:37:10–:15, 23:37:20-:27) (McIntire Video at 23:37:02, 23:37:12, 23:37:22) (Kolb Video at 23:37:05–:07)]. However, in the videos, the movement appears almost involuntary; Tucker is not aiming his legs in any particular direction. Therefore, although Tucker's legs were moving during some portions of the struggle on the ground, the Court infers that he was not deliberately attempting to kick any of the officers. Moreover, because he was lying face down with four officers surrounding him, the Court also infers that the movement of his legs was not designed to enable him to flee.

Although Tucker asserts as a disputed material fact that he was not resisting arrest, [Record Document 32-1 at 3], he does not dispute that he did not immediately place his hands behind his back after falling to the ground, [Record Document 29-2 at 2–3]. The two pieces of deposition testimony to which Tucker points are not to the contrary. The first refers to his claim that he did not pull away <u>before</u> being taken down to the ground. [Record Document 32-3 at 57]. In the second, he stated, "I never punched, I never pushed, I never did anything physically to an officer ever . . . ." [*Id.* at 21]. Defendant Officers have not claimed that Tucker punched or pushed them; they assert that he continued to resist being handcuffed by kicking his legs, squirming around, and refusing to place his hands behind his back. [Record Document 29-2 at 2–3]. Tucker has not disputed this behavior, and so the Court must take as uncontroverted that he was neither lying still nor complying with Defendant Officers' orders to place his hands behind his back.

## F.    Force Used on Tucker on the Ground

The three videos of the arrest show Defendant Officers repeatedly punching Tucker as he lay on the ground. Each struck him at least once. Cisco admits to "multiple hard closed hand strikes" to Tucker's shoulder and rib cage and "a few additional hard closed hand strikes," at least two of which were to Tucker's face; a video of the incident shows at least three strikes.[2] [Record Document 29-3 at 3 (Cisco Video at 23:37:08–:11), 7, 42, 46]. McIntire admits to two palm strikes on Tucker's face, a knee strike, at least one punch to the face, and possibly punches to Tucker's back and shoulder blades; his video shows at least two blows. [*Id.* at 3 (McIntire Video at 23:37:01–:04), 72, 81–82]. Although Johnson stated that he could not recall punching or kicking Tucker, [*id.* at 108], Kolb's video clearly shows Johnson striking Tucker at least once, [*id.* at 3 (Kolb Video at 23:37:08–:09)]. Kolb also denies memory of punching or knee-striking Tucker, but McIntire testified that Kolb delivered a knee strike, and Kolb admits that video of the arrest shows him punching Tyler, [*id.* at 124]; in McIntire's video Kolb strikes Tucker at least three times, [*id.* at 3 (McIntire Video at 23:37:07–:11)].

All parties agree that Tucker suffered a cut on his forehead and a strained left shoulder. [Record Document 29-2 at 3]. Tucker also claims that he had a black eye for several days after the incident, a severe headache, and a "sprung knee." [Record Document 32-3 at 69–72]. Even accepting, as this Court must, that Tucker suffered the injuries he claims and that they were caused by the force used against him by Defendant Officers, the relatively minor nature of

---

[2] Because it was dark and Tucker's body is generally out of the frame, the videos do not show where on his body the blows landed. As a result, the nature of the blows must be judged by Defendant Officers' preparatory movements and the injuries Tucker sustained.

Tucker's injuries prevents a reasonable inference that he was struck with the maximum amount of force Defendant Officers could employ. Indeed, the videos show Defendant Officers using relatively restrained punches with limited wind-up. [Record Document 29-3 at 3 (Cisco Video at 23:37:08–:11) (McIntire Video at 23:37:01–:13) (Kolb Video at 23:37:08–:09)]. Thus, the Court infers that the force with which Defendant Officers delivered their blows was not the maximum that they could have used.

Tucker claims that he was kicked by at least one of the officers; Cisco denies that any officer kicked Tucker. [*Id.* at 46–47, 146]. A dashcam video shows McIntire's thigh moving at least three times in a manner that is consistent with either a knee strike (to which McIntire admits) or a kick. [*Id.* at 3 (McIntire Video at 23:37:05–:08)]. Because the video does not show whether the part of McIntire's body that made contact with Tucker was a foot or a knee and given the need to resolve the disputed questions in Tucker's favor, the Court infers that McIntire kicked Tucker at least three times.

The angle of the cameras and the location of the officers prevent a viewer from determining the precise point at which Tucker complied with the order to place his hands behind his back. A jury, viewing the video footage, could determine that Tucker was struck after he had become compliant. Because this Court must view the facts in the light most favorable to Tucker, the Court infers that Defendants Officers struck Tucker at least once after he complied with their orders.

## IV. Individual-Capacity Claims Against Defendant Officers

There are two distinct moments of force that must be separately analyzed: McIntire and Cisco taking Tucker to the ground, and Defendant Officers punching and kicking him as

he lay on the ground. Defendants argue that Defendant Officers did not violate Tucker's Fourth Amendment right to be free from unreasonable seizure and, alternately, that they are entitled to qualified immunity. [Record Document 29-1 at 8–17]. Tucker asserts that the degree of force used was objectively unreasonable given that he was being arrested for minor offenses, posed no danger to the group of three or four officers, and was not actively resisting arrest. [Record Document 32 at 10–14].

### A. Fourth Amendment Standard

To prevail on an excessive force claim, a plaintiff "must establish '(1) an injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable.'" *Ontiveros v. City of Rosenberg*, 564 F.3d 379, 382 (5th Cir. 2009) (quoting *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007)). Excessiveness turns upon whether the degree of force used was reasonable in light of the totality of the circumstances facing the officer. *Graham v. Connor*, 490 U.S. 386, 396 (1989) (citing *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)). Relevant factors include the "severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight" (the "*Graham* factors"). *Id.* (citing *Garner*, 471 U.S. at 8–9). "[O]fficers must assess not only the need for force, but also 'the relationship between the need and the amount of force used.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (per curiam) (quoting *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999)).

### B.  Qualified Immunity Under § 1983

A police officer who violates a person's Fourth Amendment right to be free of unreasonable searches and seizures is entitled to qualified immunity against individual-capacity suits unless the officer's conduct was unreasonable in light of clearly established law. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). Once a defendant asserts qualified immunity, a plaintiff must prove (1) that a federal constitutional or statutory right was violated; and (2) that the right was clearly established at the time of the violation. *King*, 821 F.3d at 653 (citing *Collier v. Montgomery*, 569 F.3d 214, 217 (5th Cir. 2009); *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) (en banc)). These two prongs may be evaluated in either order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

At the summary judgment stage, a plaintiff satisfies the first prong by establishing that "genuine issues of material fact exist regarding the reasonableness of the official's conduct." *King*, 821 F. 3d at 654 (quoting *Gates v. Tex. Dep't of Protective & Regulatory Servs.*, 537 F.3d 404, 419 (5th Cir. 2008)). This proof need not be "absolute," but must consist of more than "mere allegations." *Id.* (quoting *Manis*, 585 F.3d at 843).

The second prong requires a clearly established legal principle found in the holdings of either "controlling authority" or a "robust 'consensus of cases of persuasive authority,'" *al-Kidd*, 563 U.S. at 741–42 (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)), and defined with a "high 'degree of specificity,'" *Wesby*, 138 S. Ct. at 590 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 309 (2015) (per curiam)). Existing authority must do more than merely suggest or imply the desired rule of law; rather, "[t]he precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* (citing

*Reichle v. Howards*, 566 U.S. 658, 666 (2012)). This test ensures that officials have "fair warning" that particular conduct violates the Constitution. *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016) (quoting *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (en banc)).

Not only must the rule itself be clearly defined, its application to the particular circumstances confronting the offending officer must be similarly clear. *Saucier v. Katz*, 533 U.S. 194, 202 (2001) (citing *Wilson*, 562 U.S. at 615) (identifying the relevant inquiry as "whether it would be clear to a reasonable officer that his conduct was unlawful <u>in the situation he confronted</u>" (emphasis added)). Because the situations in which police officers on patrol must apply the Fourth Amendment to the facts before them are as varied as life itself, the "'specificity' of the rule is 'especially important in the Fourth Amendment context.'" *Wesby*, 138 S. Ct. at 590 (quoting *Mullenix*, 136 S. Ct. at 308). For this reason, unless the conduct at issue is so obviously unlawful that every reasonable officer would be on notice of the unlawfulness without the assistance of precedent, *id.* (citing *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)), a plaintiff seeking to overcome qualified immunity must "identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam). The operative word here is "similar." There may be "notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Kinney*, 367 F.3d at 350 (quoting *Hope v. Pelzer*, 536 U.S. 730, 740 (2002)).

## C.    Injury

Defendants strenuously argue that any injury Tucker suffered was merely *de minimis* and thus without constitutional significance. [Record Document 29-1 at 9–12]. *De minimis* injuries during a police encounter do not give rise § 1983 liability. *Freeman*, 483 F.3d at 416 (citing *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001)). Nevertheless, "[w]hether an injury is cognizable and whether the use of force is objectively reasonable are inextricably linked questions." *Flores v. City of Palacios*, 381 F.3d 391, 398 n.6 (5th Cir. 2004). As a result, "as long as a plaintiff has suffered some injury, even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013) (per curiam) (internal citations and quotation marks omitted).[3]

It is undisputed that as a result of Defendant Officers' actions, Tucker cut his forehead and strained his left shoulder. [Record Document 29-2 at 3]. While these injuries are unlikely to be sufficiently severe if the takedown and subsequent blows were reasonable, if the police maneuvers selected were unreasonable, then these injuries may be of constitutional significance. Moreover, one can clearly hear on the video a change in the tone of Tucker's voice; the sound is that of a man in significant pain. [Record Document 29-3 at 3 (Kolb Video at 23:37:30–:55)]. Tucker has also testified that he had a black eye for several days after the

---

[3] Although *Brown* is not precedential, the Fifth Circuit supported this proposition by citation to precedential decisions. *See* 524 F. App'x at 79 nn.38–40 (citing *Schmidt v. Gray*, 399 F. App'x 925, 928 (5th Cir. 2010) (per curiam); *Flores*, 381 F.3d at 398; *Ikerd v. Blair*, 101 F.3d 430, 434 (5th Cir. 1996)).

incident, a headache, and a "sprung" knee. [Record Document 32-3 at 69–72].[4] More

significantly, he has testified to psychological damage, including extreme fear of the police that

affects his ability to navigate the world. [*Id.* at 81–82]. Because the Court must make inferences

in Tucker's favor on summary judgment, the Court finds that he has established a

constitutional injury.

**D.    Causation**

As there is no suggestion that Tucker's injuries were caused by anything other than

Defendant Officers' conduct, this element is satisfied.

**E.    Reasonableness in the Takedown**

**1.    Substantive Reasonableness**

An officer making a lawful arrest may place a suspect in handcuffs and may use

reasonable force in order to do so. *See Graham*, 490 U.S. at 396 (citing *Terry v. Ohio*, 392 U.S. 1,

22–27 (1968) ("[T]he right to make an arrest or investigatory stop necessarily carries with it

the right to use some degree of physical coercion or threat thereof to effect it."). Under

Louisiana law, a driver may not "intentionally refuse to bring a vehicle . . . to a stop knowing

that he has been given a visual and audible signal to stop by a police officer when the officer

has reasonable grounds to believe that the driver has committed an offense." La. Stat. Ann.

§ 14:108.1(A) (2018). Because Tucker did not contravene Defendants' assertion that his brake

---

[4] Tucker has not provided expert medical evidence regarding the physical and psychological conditions other than the facial cut and the strained left shoulder. Nevertheless, the presence of a black eye, a headache, and a painful knee are not sufficiently complex medical conditions as to require expert testimony to establish that they existed or were likely caused by the encounter with Defendant Officers.

and license plate lights were out, [Record Document 29-2 at 1], the Court takes those facts as established. The nonfunctional lights constitute offenses for which an officer may pull a driver over. *See Whren v. United States*, 517 U.S. 806, 810 (1996) (citing *Delaware v. Prouse*, 440 U.S. 648, 659 (1979); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam)). Hence, Cisco had probable cause to arrest Tucker for flight from an officer once Cisco activated his siren and lights and Tucker failed to stop. Although Tucker's assertion that he was seeking a safe place to stop might operate as a defense, this defense to a charge of flight from an officer does not negate the existence of probable cause. Thus, Defendant Officers were entitled to use reasonable force to place Tucker in handcuffs.

To evaluate the reasonableness of the force used during an arrest, a court must look to totality of the circumstances confronting the arresting officers; these circumstances must include the *Graham* factors: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether [he] is actively resisting arrest or attempting to evade arrest by flight." *Westfall v. Luna*, 903 F.3d 534, 547 (5th Cir. 2018) (per curiam) (quoting *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017)).

Tucker was booked for failure to have working brake and license plate lights, for flight from an officer, and for public intimidation. [Record Document 29-3 at 5]. The first two are merely traffic offenses. La. Stat. Ann. §§ 32:304(C), 32:319(A) (2013). Flight from an officer is a misdemeanor. *State v. Williams*, 2007-0931, p. 3 (La. 2/26/08); 978 So. 2d 895, 896 (per curiam). Public intimidation is a felony. *State v. Godfrey*, 2009-0630, p. 1 (La. 12/1/09); 25 So. 3d 756, 757 (per curiam).

In this context, public intimidation is "the use of violence, force or threats" upon a public employee "with the intent to influence his conduct in relation to his position, employment, or duty." La. Stat. Ann. § 14:122(A) (2018). Based on Cisco's report, Tucker committed this offense by threatening to pursue legal action against the officers and get them fired. [Record Document 29-3 at 7–8]. As these threats occurred only after Tucker was handcuffed and subdued, this offense cannot be used to justify the force applied to Tucker during the takedown or while on the ground. Therefore, for purposes of evaluating the severity of the crime, Defendant Officers were faced with a suspect who may have committed two traffic violations and one non-violent misdemeanor.

A minor traffic violation "mak[es] the need for force substantially lower" than that appropriate when a suspect may have committed a serious offense. *Deville*, 567 F.3d at 167. Similarly, the fact that an alleged offense is a misdemeanor "militate[s] against use of force." *Trammell*, 868 F.3d at 340 (citing *Reyes v. Bridgewater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010)). Moreover, Cisco admits that while Tucker did not stop immediately once he was signaled, he drove safely until he brought his car to a stop. [Record Document 32-4 at 3–4]. Thus, the nature of Tucker's alleged offenses weighs in favor of a finding that less force was justified in gaining control over him.

Factors relevant to determining the threat a suspect poses include whether he is "suspected of committing a violent offense, " *Darden v. City of Fort Worth*, 880 F.3d 722, 729 (5th Cir. 2018) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)), whether the suspect has verbally or physically threatened the officers, *id.*, and whether the suspect's hands are visible, *Cooper*, 844 F.3d at 522–23. The fact that a nonviolent suspect is unsearched is

insufficient, "standing alone, to permit a reasonable officer to characterize a suspect as an immediate threat." *Id.* at 523 n.2. Similarly, pulling an arm away from an officer, without more, does not create a credible threat to officer safety. *Ramirez v. Martinez*, 716 F.3d 369, 378 (5th Cir. 2013).

Although Tucker was loudly arguing with Cisco during the pat-down, he remained where Cisco had instructed him to be and kept his hands visible either above the hood of Cisco's cruiser or behind his back. [Record Document 29-3 at 3 (Cisco Video at 23:36:23–:59)]. Tucker made emphatic but nonthreatening gestures, but kept his hands pointed away from Cisco while doing so. [*Id.*]. Tucker is taller than Cisco, [Record Document 29-2 at 2], but by the time of the takedown there were three officers within feet of Tucker, [Record Document 29-3 at 3 (Cisco Video at 23:36:56) (McIntire Video at 23:36:59)], suggesting that a lesser quantum of force was needed to ameliorate any threat that his size may have posed. Moreover, Tucker verbally threatened Defendant Officers only after he was handcuffed and placed in the back of Cisco's cruiser, and so these threats cannot justify the force used against him prior to that point. [*Id.* at 7–8]. Finally, as discussed above, the Court infers that a reasonable officer in the position of Cisco, McIntire, and Johnson would have believed that Tucker had been disarmed after Cisco removed the pocketknife. Thus, when viewing the facts in the light most favorable to Tucker, this factor favors a reduced use of force.

Although Tucker did not stop immediately after Cisco activated his lights and siren, Tucker did not attempt to evade the stop. [Record Documents 29-3 at 3 (Cisco Video at 23:33:42–:35:40) and 32-3 at 49–52]. He exited his car when ordered and allowed himself to be searched, making no moves to run away. [Record Documents 29-2 at 2, 29-3 at 3 (Cisco

Video at 23:36:19–:59), and 32-3 at 54, 56–57]. Although Tucker was verbally oppositional and loudly complained about what he characterized as police harassment, [Record Documents 29-2 at 2, 29-3 at 3 (Cisco Video at 23:36:26–:59), and 32-3 at 55], under the version of the facts this Court must use at summary judgment, he provided no physical resistance prior to the takedown. While verbal resistance can be considered when assessing the degree of force that is reasonable under the circumstances, *Poole v. City of Shreveport*, 691 F.3d 624, 629 (5th Cir. 2012) (citing *Galvan v. City of San Antonio*, 435 F. App'x 309, 311 (5th Cir. 2010) (per curiam)), the fact that Cisco and McIntire were faced with only verbal but not physical resistance weighs in favor of a reduced use of force.

Officers must consider "'the relationship between the need and the amount of force used.'" *Deville*, 567 F.3d at 167 (quoting *Gomez*, 163 F.3d at 923). When force is authorized, officers must respond with "'measured and ascending' actions" that correspond to the resistance they face. *Poole*, 691 F.3d at 629 (quoting *Galvan*, 435 F. App'x at 311). As the need to use force was relatively low on the basis of the *Graham* factors, the quantum of force that could be lawfully applied was similarly reduced.

Here, Tucker had not been told that he was under arrest and had complied (in his version of the facts) with the request to place his hands behind his back. McIntire gave no verbal commands before, mere seconds after arriving on the scene, pulling Tucker down to the ground. In light of Tucker's verbal objections and the discovery of a knife in his pocket, McIntire and Cisco would have been justified in using some force to place Tucker in handcuffs had he refused to cooperate in allowing them to be placed. However, the immediate resort to a takedown maneuver was not necessarily a measured and ascending response to the need to

place handcuffs on a non-struggling Tucker without first articulating that he was under arrest and giving him a reasonable opportunity to allow himself to be handcuffed. As a result, viewing the facts in the light most favorable to Tucker, a jury could find that Cisco and McIntire had acted unreasonably.

### 2. Qualified Immunity

Although fact questions prevent granting summary judgment on the question of whether Cisco and McIntire violated Tucker's Fourth Amendment rights, the two officers may still be released from suit on this claim if they are entitled to qualified immunity. To defeat qualified immunity, Tucker must point to a case holding that officers acting in similar ways under similar circumstances violated a suspect's right to be free from excessive force. *White*, 137 S. Ct. at 552.

As of 2013, it was clearly established that "violently slam[ming] an arrestee who is not actively resisting arrest" is a constitutional violation. *Darden*, 880 F.3d at 731 (citing *Ramirez*, 716 F. 3d at 377–78; *Newman v. Guedry*, 703 F.3d 757, 762–63 (5th Cir. 2012); *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)). Passive resistance does not authorize violent force on an officer's part. *Deville*, 567 F.3d at 167–68. As a result, the Fifth Circuit has repeatedly denied qualified immunity in cases in which "officers face verbal resistance but no fleeing suspect." *Bone v. Dunnaway*, 657 F. App'x 258, 263 (5th Cir. 2016) (per curiam) (citing *Deville*, 567 F.3d at 169; *Bush*, 513 F.3d at 502; *Goodson v. City of Corpus Christi*, 202 F.3d 730, 734, 740 (5th Cir. 2000)). Even though Tucker was offering some degree of verbal resistance, in the absence of overt physical resistance to being handcuffed, flight or the prospect of flight, and instructions or warnings beyond one request to place his hands behind his back, forcefully pulling Tucker

to the ground such that his face struck the concrete would have violated clearly established law. Therefore, McIntire and Cisco are not entitled to qualified immunity for the force used in the takedown.[5]

## F.    Reasonableness on the Ground

### 1.    Substantive Reasonableness

Once on the ground, Defendant Officers each punched Tucker at least once, and McIntire kicked him at least three times. As discussed above, the reasonableness of the officers' use of repeated strikes and kicks must be measured in light of the *Graham* factors. The misdemeanor and traffic violations of which he was suspected did not of themselves warrant a particularly high degree of force. Once he landed on the ground, four officers surrounded him and were able to handcuff him in less than a minute, [Record Document 29-3 at 3 (McIntire Video at 23:37:01–:58)]; the fact that there were four officers and that Tucker was on the ground where he had less room to maneuver suggests a reduced threat to officer safety. On the other hand, Defendant Officers have testified that Tucker was pulling his arms from their grasp and failing to put them behind his back, facts that Tucker has not disputed.

---

[5] This Court recognizes that Cisco and McIntire's actions must be analyzed separately. *Kitchen v. Dallas Cty.*, 759 F.3d 468, 480 (5th Cir. 2014) (quoting *Attebery v. Nocona Gen. Hosp.*, 430 F.3d 245, 253 (5th Cir. 2005)), *abrogated on other grounds by Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). However, the evidence before this Court does not permit clear assignment of responsibility for the physical force used in the takedown. [Record Document 29-2 at 2]. For instance, Cisco contradictorily claims that "we [Cisco and McIntire] took him to the ground" and that "I pushed him toward the ground," [Record Document 29-3 at 38–39], while Tucker has testified that McIntire "just pulled me down to the ground," [Record Document 32-3 at 54–55]. Thus, because the person responsible for Tucker's descent to the ground cannot be clearly identified, this Court cannot at this stage of proceedings separate the actions of the two officers in effecting the takedown.

[*Id.* at 75, 106–07, 123]. Although the Court infers for summary judgment purposes that a reasonable officer with the knowledge of Cisco, McIntire, and Johnson would not have believed that Tucker was armed, Kolb did not witness the patdown and so could reasonably have believed that Tucker was armed. While Tucker was not attempting to flee, he was kicking his legs while on the ground and was not laying still in order to allow himself to be handcuffed. As discussed above, the Court infers for summary judgment purposes that he was not intentionally kicking <u>at</u> the officers. Nevertheless, these kicks were a form of physical resistance. On these facts, Defendant Officers were entitled to use heightened force in order to gain control of Tucker's hands and place him in handcuffs. *See Mathews v. Davidson*, 674 F. App'x 394, 396 (5th Cir. 2017) (per curiam); *Carroll v. Ellington*, 800 F.3d 154, 176 (5th Cir. 2015).

The question then becomes whether the particular force used was reasonable in light of the heightened force that Defendant Officers could lawfully use at this point. *Deville*, 562 F.3d at 167 (quoting *Gomez*, 163 F.3d at 923)). Distraction strikes and even kicks designed to gain compliance to being handcuffed are "measured or ascending" responses to an actively resisting suspect. *Poole*, 691 F.3d at 629 (quoting *Galvan*, 435 F. App'x at 311); *Carroll*, 800 F.3d at 176. While on the ground, Tucker was struggling. [Record Documents 29-2 at 2–3 and 29-3 at 3 (Cisco Video at 23:37:10–:26) (McIntire Video at 23:37:10, 23:37:22) (Kolb Video at 23:37:05–:07)]. Defendant Officers struck Tucker repeatedly but without using with all their strength. And so, their resort to controlled strikes in order to cause Tucker to cease moving about and submit to being handcuffed would not necessarily violate the Fourth Amendment.

A difficulty arises here because a use of force that may begin as reasonably necessary in order to obtain compliance may cease to be so as a suspect becomes more compliant. *See Carroll*, 800 F.3d at 177 (citing *Bush*, 513 F.3d at 501–02; *Gomez*, 163 F.3d at 922, 924–25) ("[O]nce a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive."). The videos do not show most of Tucker's body. Given the inability to know if Tucker had stopped resisting and placed his hands behind his back before the blows ceased, the Court cannot determine as a matter of law that the sheer number of blows and kicks that he received was reasonable. Hence, the Court denies summary judgment on the issue of whether Defendant Officers violated Tucker's Fourth Amendment rights.

## 2. Qualified Immunity

However, this claim may still be put to rest if Defendant Officers are entitled to qualified immunity. They are immune from suit unless caselaw has established, on similar facts, that their conduct violated the Fourth Amendment. *See White*, 137 S. Ct. at 552. Tucker points the Court to *Bush v. Strain* in which the plaintiff was handcuffed and subdued at the time the defendant officer slammed her face into a nearby vehicle. 513 F.3d at 501. As Tucker was neither restrained nor subdued when Defendant Officers began to strike him, *Bush* does not clearly establish that Defendant Officers should have known that they could not strike Tucker in order to gain his compliance. However, *Bush* does clearly establish that once Tucker ceased kicking his legs and was handcuffed, the violent striking of him needed to stop. *See id.* Because the video does not clearly show the precise point at which Tucker ceased moving and was finally handcuffed, this factual uncertainty prevents the Court from concluding that all of the

force used by Defendant Officers as Tucker lay on the ground complied with the clearly established principle that officers cannot strike a subdued and restrained suspect. Because Defendant Officers are not entitled to qualified immunity for the force used against Tucker as he lay on the ground, summary judgment is denied.

## V.  *Monell* Claim Against the City

Tucker alleges that the City is liable for maintaining policies, customs, or practices that allowed Defendant Officers to violate his constitutional rights. [Record Document 1 at 6–7]. To impose liability on a municipality under § 1983, a plaintiff must prove three elements: a "policymaker[,] an official policy[,] and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Hous.*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "[W]ithout an underlying constitutional violation, an essential element of municipal liability is missing." *Windham v. Harris Cty.*, 875 F.3d 229, 243 (5th Cir. 2017) (quoting *Doe ex rel. Magee v. Covington Cty. Sch. Dist. ex rel. Keys*, 675 F.3d 849 866–67 (5th Cir. 2012) (en banc)).

Defendants' motion does not address the existence of a policymaker or a policy. [Record Document 29]. Although Defendants' reply memorandum, for the first time, argues that Tucker has not presented evidence of a policy or that a policymaker acted with deliberate indifference, [Record Document 33 at 7], their statement of undisputed material facts contains <u>no</u> references to the City or a policy, [Record Document 29-2]. Their memorandum in support of their motion for summary judgment likewise fails to address these elements. [Record Document 29-1]. "Arguments raised for the first time in a reply brief are waived." *Lewis v. City of Shreveport*, No. CV 16-1115, 2017 WL 519244, at *4 (W.D. La. Feb. 6, 2017) (citing *Jones v.*

*Cain*, 600 F.3d 527, 541 (5th Cir. 2010)). As a result, the Court will not consider Defendants' argument that Tucker has failed to carry his burden on the first two elements of his *Monell* claim.

Although not framing their discussion in terms of municipal liability, Defendants do spend much of their summary judgment motion arguing that Defendant Officers did not violate the Fourth Amendment. [Record Document 29-1 at 8–17]. As discussed above, a jury could find that a reasonable officer would not have pulled Tucker to the ground mere seconds after arriving on the scene nor would a reasonable officer have pushed Tucker to the ground without giving him time to comply with an order to place his hands behind his back. Likewise, because the summary judgment evidence does not clearly indicate all of Tucker's behavior while he lay on the ground, the Court cannot determine as a matter of law that all of the force used upon him was reasonable. Because Defendant Officers are not entitled to summary judgment on the constitutional question, the City is not entitled to summary judgment on Tucker's *Monell* claim.

## VI.   Official-Capacity Claims Against Defendant Officers

Tucker brings claims against Defendant Officers in their individual and official capacities. [Record Document 1 at 3–4]. An official capacity suit against a municipal officer duplicates a suit against the officer's municipality. *Turner v. Houma Mun. Fire & Police Civil Serv. Bd.*, 229 F.3d 478, 483 (5th Cir. 2000) (citing *Kentucky v. Graham*, 473 U.S. 159, 165 (1985)). A district court faced with both claims may dismiss the official-capacity claim. *Castro Romero v. Becker*, 256 F.3d 349, 355 (5th Cir. 2001) (citing *Flores v. Cameron Cty.*, 92 F.3d 258, 261 (5th

Cir. 1996)). Therefore, the official-capacity claims against Defendant Officers are dismissed as duplicative of the *Monell* claim against the City.

## VII. <u>State Constitutional Claims</u>

Paralleling his causes of action under the Fourth Amendment, Tucker alleges that Defendants violated the right to privacy guaranteed by the Louisiana Constitution: "[e]very person shall be secure in his person, property, communications, houses, papers, and effects against unreasonable searches, seizures, or invasions of privacy." La. Const. art. I, § 5. Although the Louisiana Supreme Court has not articulated a clear standard for state constitutional claims alleging excessive force, "Louisiana federal district courts have noted that principles embodied in the Fourth Amendment have been incorporated into Article I, Section 5 of the Louisiana Constitution." *Shepherd v. City of Shreveport*, No. 14-2623, 2018 WL 1513679, at *10 (W.D. La. Mar. 27, 2018) (citing *Todd v. City of Natchitoches*, 238 F. Supp. 793, 798–99 (W.D. La. 2002), *appeal dismissed on other grounds*, 72 F. App'x 969). In the absence of more precise guidance from the Louisiana Supreme Court on this issue, this Court concludes that in excessive-force cases Fourth Amendment standards control the analysis of alleged infringements on the constitutional right to privacy.

In *Moresi v. State ex rel. Department of Wildlife & Fisheries*, the Louisiana Supreme Court determined that state officers are entitled to qualified immunity if they can show that the "state constitutional right alleged to have been violated was not clearly established." 567 So. 2d 1081, 1094 (La. 1990). Interpreting *Moresi*, the Fifth Circuit has held that when plaintiffs' state constitutional claims "parallel entirely" their § 1983 claims, qualified immunity applies to the state law claims if it applies to the federal claims. *Roberts v. City of Shreveport*, 397 F.3d 287, 296

(5th Cir. 2005). This Court has found that fact issues prevent summary judgment on the basis of qualified immunity in the § 1983 context; the same result follows for Tucker's state constitutional claims. Therefore, Tucker's state constitutional claims against Defendant Officers survive summary judgment.

Defendants make no argument regarding the City's liability on the constitutional claim other than that no violation of rights occurred. Because the Court cannot grant summary judgment on that theory for the reasons given above and because qualified immunity does not apply to the City, Tucker's claims against the City under the state constitution also survive summary judgment.

## VIII. <u>State Tort Claims</u>

Tucker alleges that the beating he endured constituted battery and excessive force in violation of Article 2315 of the Louisiana Civil Code. [Record Document 1 at 7–8]. Defendants argue that the same standards apply to Tucker's state law claims as to his federal claims. [Record Document 29-1 at 8 n.4]. However, the caselaw that they cite makes it clear that this rule holds true only for claims arising under the state constitution. *See, e.g., Reneau v. City of New Orleans*, No. Civ.A. 03-1410, 2004 WL 1497711, at *4 (E.D. La. July 2, 2004) (citing *Mathiew v. Imperial Toy Corp.*, 94-0952, p. 6 (La. 11/30/94); 646 So. 2d 318, 323 (La. 1994); *Kyle v. City of New Orleans*, 353 So. 2d 969, 973 (La. 1977)) ("Under Louisiana law, the same standard is used in analyzing a state law claim of excessive force <u>as a constitutional claim</u> . . . ." (emphasis added)). To obtain summary judgment on Tucker's tort claims, Defendants have the burden of establishing their right to judgment as a matter of law under the correct legal standard.

Under the Louisiana Code of Criminal Procedure, a "person making a lawful arrest may use reasonable force to effect the arrest and detention, and also to overcome any resistance or threatened resistance of the person being arrested or detained." La. Code Crim. Proc. Ann. art. 220 (2003). Unreasonable or excessive force exposes officers and their agencies to tort liability. *Kyle*, 353 So. 2d at 972. In *Kyle v. City of New Orleans*, the Louisiana Supreme Court identified the duty owed by officers when effecting a lawful arrest—to act reasonably in light of the totality of the circumstances. *Id.* at 972–73. The reasonableness of the force used is measured from the perspective of "ordinary, prudent, and reasonable [persons] placed in the same position as the officers and with the same knowledge as the officers." *Id.* at 973 (citing *Picou v. Terrebonne Par. Sheriff's Office*, 343 So. 2d 306 (La. Ct. App. 1977)). The *Kyle* court also identified seven factors (the "*Kyle* factors") by which to evaluate the reasonableness of an officer's conduct:

> the known character of the arrestee, the risks and dangers faced by the officers, the nature of the offense involved, the chance of the arrestee's escape if the particular means are not employed, the existence of alternative methods of arrest, the physical size, strength, and weaponry of the officers as compared to the arrestee, and the exigencies of the moment.

*Id.* Louisiana's Second Circuit Court of Appeal has recognized an eighth factor: whether a suspect was "intoxicated, belligerent, offensive, or uncooperative." *Hall v. City of Shreveport*, 45,205, p. 6 (La. App. 2 Cir. 4/28/10); 36 So. 3d 419, 423 (citing *Evans v. Hawley*, 559 So. 2d 500 (La. Ct. App. 1990)). In subsequent cases, the Louisiana Supreme Court used the duty-risk analysis to evaluate excessive force as a species of negligence. *Stroik v. Ponseti*, 96-2897, p. 7 (La. 9/9/97); 699 So. 2d 1072, 1077–78; *Mathieu*, 94-0952, p. 6; 646 So. 2d at 323.

Thus, while the gravamen of a tort claim and a Fourth Amendment claim is the same, i.e., reasonableness, the Louisiana Supreme Court has provided a set of factors that differ from the *Graham* factors. *Compare Kyle*, 353 So. 2d at 973 (citing *Picou*, 343 So. 2d 306) *with Graham*, 490 U.S. at 396 (citing *Garner*, 417 U.S. at 8–9). Although similar, the sets are not identical, and, as such, this Court cannot conclude from Defendants' motion that they have demonstrated their right to judgment as a matter of law on Tucker's tort claims. As Defendants failed to address the standards for excessive force as a tort, summary judgment must be denied on this claim.

## IX.  <u>Conclusion</u>

For the reasons given above, the motion is **GRANTED IN PART** and **DENIED IN PART**. It is **GRANTED** on the official capacity claims against Defendant Officers. It is **DENIED** as to all other claims.

The claims on which summary judgment has been granted are hereby **DISMISSED WITH PREJUDICE**.

**THUS DONE AND SIGNED** in Shreveport, Louisiana, this ____ day of _____, 2019.

_____
ELIZABETH ERNY FOOTE
UNITED STATES DISTRICT JUDGE